## Burton *vs.* Stewart.

It having been decided that the corporation known as " The Onondaga Fine Salt Manufacturing Company" was organized for an illegal purpose; and that all contracts entered into with it for giving effect to the illegal purposes of the corporation are illegal and void, that question is not open for discussion.

Accordingly *held* that a promissory note, made by the defendant, and given to the corporation upon a settlement between it and him, of dealings growing out of the illegal operations of such corporation, was, as between the original parties to that note, illegal and void.

The plaintiff was the president of such corporation. He became the payee and indorser of the note without any request, and without the knowledge of the defendant. As agent of the corporation he settled with the defendant, and

Burton *v.* Stewart.

had knowledge of the consideration of the note. *Held* that as between the plaintiff and the defendant, the note was without any consideration to support it.

But that when such note was transferred to a bank, and by it discounted, before maturity, and without notice, for value paid, it became, in the hands of the bank, valid and operative against all the parties to it.

And that while the note was in the hands of the bank or of any other parties deriving title by, through or under it, the defendant could not avail himself of the defense which, as against the plaintiff or other holder not *bona fide* he had, to the note.

*Held, also,* that the defendant being liable upon such note, when it matured, for the full amount, and the debt being valid against all the parties to the paper, a new note given by the defendant in renewal of, and to take up, the former, was, as between the bank, then the holder, and the parties to the new note, founded upon a good consideration.

*Held,* further, that the defendant being the principal debtor to the bank, and the plaintiff only surety, the renewal was to be deemed as made for the benefit of the principal debtor; and that in the absence of any proof that the plaintiff became indorser at the request of some one else, the court would presume that he became such at the request of the defendant.

It is optional with an accommodation indorser, or surety, to sue his principal either upon the note, or for the money paid upon it. If he sues upon the note, he can recover no more than the face of the note, with interest; whereas, by suing for the money, he becomes entitled not only to the amount of the note and interest, but also to the costs paid by him in the suit upon it.

APPEAL by the defendant from a judgment entered upon the report of a referee. The action was brought against the defendant as indorser of a promissory note.

The complaint alleged that the defendant, on the 13th day of September, 1858, made his promissory note in writing, dated on that day, whereby, for value received, he promised to pay to the order of the plaintiff $592.99, sixty days after said date, at the Bank of Salina, and thereupon delivered the said note to the plaintiff who now owns it, and it has not been paid by the defendant, and the whole amount thereof is due and unpaid. Th plaintiff, for a further cause of action, alleged that after the making of the note, in the first count mentioned, the defendant, at the request of the plaintiff and for his accommodation, indorsed the same and redelivered said note to the defend-

ant. That the defendant transferred said note for a valuable consideration before it came due, and when due it was duly protested for non-payment, and the plaintiff was duly charged as indorser. That afterwards a suit was commenced on said note by the holder, against the plaintiff, and judgment was recovered against him thereon, and the plaintiff afterwards, and on the 2d day of July, 1860, was compelled to pay on said judgment the sum of $660.79 damages, and $51.51 costs, and did pay said sums, on said day. That the defendant, although bound to and requested to, had not repaid said sums to the plaintiff. Wherefore, the plaintiff demanded judgment against the defendant for $712.30, with interest from July 2, 1860, with costs.

The defendant, by his answer, denied each and every allegation, claim and statement in the complaint contained. For a second and other defense, he alleged that said note was executed by the defendant to the plaintiff for his, the plaintiff's accommodation, and lent by the defendant to the plaintiff, and without any consideration passsing between the parties thereto or otherwise. That said note was made by the defendant to the plaintiff for the purpose of enabling the latter to raise the money thereon for his own use and for no other purpose, and the plaintiff then agreed with the defendant that when the same became due, he, the plaintiff, would take up and pay the same; and the defendant alleged that if any damage accrued to the plaintiff from said note not being taken up and paid at maturity, it was the plaintiff's own fault and neglect, and not that of the defendant.

For a third and other defense, the defendant alleged that on or about the 20th day of April, 1857, a pretended company or corporation, known as the Onondaga Fine Salt Manufacturing Company," was organized, of which all or nearly all the manufacturers of fine salt in the county of Onondaga, including the defendant and the plaintiff, were members, and of which the plaintiff was one of the trus-

Burton *v.* Stewart.

tees and president, for the pretended object and purpose of manufacturing and selling salt; that at that time the manufacture of fine salt in said county was carried on in about 300 fine salt blocks situated upon the Salt Springs reservation, owned or controlled by a large number of individuals. That trustees of said pretended company were elected, and contracts were thereupon made by and between the several owners of salt blocks as aforesaid and the said company, in writing, whereby each of said fine salt manufacturers leased to said company, for one year, their several salt blocks, with the right of ingress and egress to and from the same, and whereby said several lessors agreed to manufacture in the blocks so leased by them, for said company, an amount of salt which should be prescribed by said company, not less than 17,000 bushels, for a price and sum fixed to be paid by said company—the said lessors paying all the expenses of said manufacture—and said lessors were prohibited from manufacturing or selling salt, except for said company. That by virtue of the several contracts and leases aforesaid, the said company controlled all or nearly all the fine salt manufactured upon said reservation in that year. That the price for which said salt should be sold by said company was fixed and regulated by the company and its trustees, and the members thereof were entitled to share in the profits of said company, according to the amount of salt manufactured by them respectively. That the true and only object and intent for which said corporation was organized, and said leases and contracts were made, and said company was conducted and carried on, was to fix the time and manner of running said salt blocks, and the amount of salt to be manufactured therein, and to increase, regulate, fix and control the price of all the fine salt manufactured on the Onondaga Salt Springs reservation, and to prevent competition in the sale thereof, in violation of law, and contrary to the statute in such case made and provided,

of all which the plaintiff then had full knowledge and notice. And that during the time the said company was organized, as aforesaid, the defendant, as well as the plaintiff, was the owner of salt blocks on said reservation, and was engaged in the manufacture of fine salt therein. That by the inducements and persuasions of the plaintiff and others, the defendant became a member of said company, and entered into a contract and lease with said company, and was cognizant of the object and purpose for which said company was organized, as aforesaid. That after said company was organized, and after the defendant had so executed his contract and lease with said company, and had received from the plaintiff the contract of said company, signed by the plaintiff as president thereof, he, the defendant, manufactured salt in his said block, and together with the plaintiff, as such president or pretended president, acted under such lease and contract, and then with and by the consent of said Burton, as such president and such company, the defendant took and disposed of a portion of the salt so manufactured by him in his said block, and that the note mentioned and described in the complaint was made by him and transferred to said company, in consideration of the salt so made by the defendant, and for no other or different consideration, all which said plaintiff then well knew. That said note was given by the defendant and received by said company and by said Burton as president thereof, in part performance of the stipulations in said lease and contract, and to enable said illegal company to effect the object and intent of its organization as aforesaid, and that said note, when the same was made, was, and now is, utterly and totally void, to the plaintiff's knowledge. That after the making thereof by the defendant, and before maturity and before the same had any legal inception, the plaintiff wrongfully negotiated and indorsed the same to the Syracuse City Bank, for his own benefit, and not for the benefit of the defendant in any respect;

Burton *v.* Stewart.

that after the same became due, the plaintiff was sued upon and obliged to pay said note as such indorser, and not otherwise, and so the defendant alleged that if any damage accrued to the plaintiff, it was entirely his own fault and not the fault, neglect or default of the defendant in any respect.

The defendant, for further answer and counter claim to the complaint, alleged that the note mentioned and described in the complaint was, at the time of its execution by the defendant, void in the plaintiffs hands, and had no legal inception, from the facts, and for the reasons stated in the third answer; that said note being so invalid, the plaintiff, with full notice and knowledge that the same was void for such reasons, and before said note, by its terms, became due and payable, negotiated the same and procured it to. be discounted by a bona fide holder, to wit, the Syracuse City Bank, a banking corporation of this State, in its regular course of business as said bank, said bank having neither notice nor knowledge of the premises, nor of any of the facts touching said note's invalidity; that when said note became due it was not paid, whereupon said bank, so being the holder and owner of said paper, commenced an action thereon in this court against this defendant; that to procure said action to be discontinued, the defendant was obliged to, and did pay the costs and disbursements incurred in said action by said bank, to wit, the sum of $25, which the defendant claimed the plaintiff should refund to him, with interest. Wherefore the defendant demanded judgment that the plaintiff take nothing by his said complaint, and that the defendant have judgment against the plaintiff for $25, and costs.

The plaintiff put in a reply, denying each and every allegation of counter-claim in the answer.

The action was referred to a referee, who found the following facts:

That the plaintiff and defendant were, during the year

1857, members, and the plaintiff was the president, of a corporation organized in the city of Syracuse, in the spring of that year, under the general laws of this State, styled " The Onondaga Fine Salt Manufacturing Company," composed of most of the manufacturers of fine salt in the county of Onondaga. That the professed object of the said corporation, was the manufacture of fine salt, but the real object and purpose thereof was to control, regulate and limit the quantity of salt to be manufactured during the year 1857, and to control, regulate and increase the market price and value thereof, and to control the sales of the salt that should be manufactured. That the corporators and associates, including the defendant, to carry into effect the real purposes and object of the corporation, leased and rented to the said corporation, the salt blocks respectively and severally owned by them, and the several lessees agreed to manufauture on their respective blocks, such amount of salt as should be directed by the said company, not less than 17,000 bushels, at and for the sum of 15 cents per bushel, and deliver the same to the said corporation, and that they would not, during the said year, manufacture or sell any salt except for the said corporation. That most of the corporators and associates, or a majority of them, delivered the salt manufactured by them to the corporation, who sold the same, by its officers and agents, for the benefit and account of the corporators and associates, who were entitled to the profits of the business. That others of the associates sold the salt manufactured by them, and accounted for the same to the corporation. That the defendant delivered a few hundred barrels of salt manufactured by him on his block at the commencement of the season, to the corporation, and after that, with the assent, and by the acquiescence of the officers of the company, he sold the salt manufactured by him, and received the avails thereof, receiving from a trustee of the company an order for the salt, from time to time, as it was

manufactured, packed and inspected, and signing an ac-knowledgement of the receipt of the salt upon the order of the trustee, and another receipt acknowledging pay-ment for the same; that these vouchers were not given simultaneously with the disposal of the salt, but at con-venient times soon thereafter. That on the 12th day of July, 1858, the defendant and the plaintiff, the latter act-ing as the president, and on the behalf of the said corpo-ration, accounted together, of and concerning the salt manufactured by the said defendant under the said ar-rangement and lease, and the portion thereof disposed of and sold by the said defendant for his own account, includ-ing a note of over $500 of the said defendant before then given upon a partial settlement, and then past due, and held and owned by one of the banks of the city, and in-dorsed by the plaintiff, and upon such accounting, and upon this basis, adopted by the parties, and according to the course and mode of business adopted by the said corporation, there was found due and owing to the said corporation from the defendant $728.27, which said sum included the note of the defendant aforesaid, which the said plaintiff, on behalf of said company, agreed to and did pay and take up. That the defendant, to settle the said balance, and to entitle him to his share of the profits and earnings of the said corporation, did thereupon pay to the said corporation $142.36, and delivered to the plaintiff, for the said corporation, his promissory note, payable to the order of the plaintiff sixty days from the date thereof, for $585.91. That the plaintiff indorsed the said note, and procured the same to be discounted for the benefit and account of the said corporation, by the Syracuse City Bank, who was the holder and owner of the note, *bona fide*, and for value, at the time it became due, and the proceeds and avails thereof had been used by and for the said corporation. That when the said note became due, the same was protested for non-payment, and

the plaintiff, as indorser, duly charged thereon, and the note described in the complaint was thereupon made by the defendant, and indorsed by the plaintiff, to renew and take up the same, and was delivered to the said Syracuse City Bank, in renewal, and to take up the said note of July 12, 1858, and when the note mentioned in the complaint became due and payable, the same was duly presented for payment, and protested for non-payment, and the plaintiff duly charged as indorser thereon. That the defendant procured one Kenyon to purchase the said note of the bank, after the dishonor of the same as aforesaid, and to sue the plaintiff as the indorser thereof in this court, and that in said action so brought by Kenyon, a trial was had and judgment rendered for the plaintiff for the amount of the note and the costs of the action. That said amount, June 20, 1860, was, for principal and interest on the said note, $659.26, and for the costs of the said action, $51.51, which said sums were paid by the plaintiff upon the note and in said action, on the 2d day of July, 1860, with interest on the first named sum from June 20, 1860.

The referee decided and reported, as his conclusions of law upon the above facts:

1. That the purposes and objects of the said association, or corporation, were illegal.

2. That the note of July 12, 1858, as well as the previous note given by the defendant to the said corporation, was given without any valid or legal consideration, and was void when held and owned by the said corporation or by the plaintiff as its president.

3. That by the negotiation and transfer of the said note before due, for a valuable consideration, to the Syracuse City Bank, it became and was a valid and available note in the hands of the indorsee, and the defendant became and was legally bound to pay the same to the holder.

4. That the defendant, as the maker of the note, became and was primarily liable for the payment thereof, and the plaintiff secondarily liable as the indorser thereof.

5. That the note in suit, and described in the complaint, was given to the Syracuse City Bank, upon and for a good consideration, and was a valid note at the time of its inception, upon which the defendant was primarily liable as maker.

6. That the note of July 12, 1858, when held by the Syracuse City Bank, represented a debt due from the defendant to the bank, and that the note in suit was given in satisfaction of said debt, and the plaintiff, by indorsing the note, became his surety for the payment thereof.

7. That the plaintiff was entitled to recover of and from the defendant, the amount so as aforesaid paid by him upon and for the said note, and the costs of the action, with interest from the time of the payment thereof.

He therefore ordered judgment for the plaintiff, and against the defendant, for the said amount, with interest, amounting, in the aggregate, to $748.93, besides costs.

*D. Pratt,* for the appellant.

I. The note of July 12, 1858, was clearly void in the hands of Burton, in consequence of the illegality of the consideration. 1. It is found by the referee, as a matter of fact, that the company was organized for the purpose of controlling and limiting the quantity of salt manufactured, and to regulate and increase the price of salt. 2. Burton and Stewart were both active members of the company, and the note was given in the prosecution of the illegal enterprise. 3. It was therefore properly held by the referee, that the note was given without valid or legal consideration, and was void in the hands either of the plaintiff or the corporation. (1 *R. S.* 825, *Ed. ed. Laws* 1841, *ch.* 183, § 11. 20 *John.* 397. 14 *id.* 272. 7 *Wend.* 276.)

II. This note having been indorsed by Burton for the purpose of procuring it to be discounted for his own benefit, and it having been discounted for his own benefit or for the benefit of the corporation, no obligation rested upon the defendant to indemnify Burton against the liability assumed by such indorsement. 1. The note being void in the hands of Burton, as against the defendant, he could not, by any act of his own, create the relation of principal and surety between himself and the defendant. 2. Indeed, Burton, by his indorsement to the bank, became the party primarily liable to the bank rather than the defendant. (*a.*) Being made upon a new consideration, he made himself liable to the bank, although it had had notice of the original illegality of the note. (*Chitty on Bills*, 93. 4 *Barn. & Adol.* 212. 2 *Strange*, 1155. 11 *Wheat.* 298. 5 *Barb.* 398.) (*b.*) Not so with the defendant. He became liable to pay the bank, not on the ground that his contract was valid, but on the ground that the law protects the *bona fide* holder of commercial paper. (*c.*) If knowledge of the consideration of the note could have been proved against the bank, the defendant could not have been made liable at all to the bank upon it. But such knowledge would have constituted no defense to Burton. (*d.*) While, therefore, the note remained in the hands of the bank, the plaintiff was, as between himself and the defendant, the party personally liable upon it. 3. As between these two parties, therefore, the defendant clearly did not sustain the relation of surety to the plaintiff, and was under no obligation, either legal or equitable, to pay the note or indemnify him against his liability thereon.

III. The plaintiff, by taking up the note, would not succeed to the rights of the bank as against the defendant, but would be remitted simply to his original rights, and no more. Any defense which Stewart would have had against Burton, had the latter not parted with the note, he would

still have upon his repossession of it. 1. This follows necessarily as a legal corollary from the positions already taken. Being under no legal or moral obligation while the note was in the bank, as between himself and the plaintiff, to pay it or indemnify him, the obligation would in nowise be increased by the latter taking up the note and repossessing himself of it. 2. Hence it is well settled, as a legal proposition, that an indorser, upon taking up a note, does not hold it as a purchaser from the last holder, but is simply remitted to his original rights as to the parties upon it. (5 *Denio,* 220. *Chit. on Bills,* 568. 7 *T. R.* 671. *Lutwych,* 885, 888. 1 *Starkie,* 2, 3. *Story on Bills,* § 442.) Again ; if upon the first note, while in the hands of the bank, as between the parties, the plaintiff was primarily, and the defendant secondarily liable, the mere fact of Burton's indorsing the second note in renewal of the first, would furnish no consideration whatever upon which Stewart could be made liable to Burton in any court.

IV. The plaintiff, therefore, having no legal or moral claim against the defendant upon the note of July 12, either before its transfer or while held by the bank, or afterwards, had he taken it up, has no better or stronger claim against him upon the note in suit. 1. Had the last note been simply a renewal of the first while in the hands of the plaintiff, it would not be claimed that the renewal, under such circumstances, would have improved the demand or given it vitality. (6 *Barb.* 398. 4 *Comst.* 449. 11 *Wheat.* 258.) 2. It is submitted that the plaintiff now has no greater or stronger rights upon the note than if it had been renewed in his hands without a transfer. (*a.*) The note in suit was given by the defendant to the plaintiff, and by the latter indorsed to the bank. (*b.*) There was no new consideration for the last note. It was based upon the same illegal consideration as the first one. (*c.*) If the plaintiff had taken up the first note it would, as we have already seen, have been void in his hands. A note

in renewal of it would clearly be equally void. (*d.*) It is not perceived why a note in renewal, taken by the plaintiff previously to taking up the first note, would be any more free from the taint of illegality than if taken subsequently. (*e.*) It is a well established principle, that a mere change of securities to a party to the original illegal contract, or to a person having notice of it, does not purge the original illegal consideration, so as to give a right of action on the new security. (20 *John.* 286. 4 *Comst.* 449. 11 *Wheat.* 258. 4 *Denio*, 63.) 3. It is therefore submitted that the note in suit was affected in the hands of the plaintiff with the original illegal consideration, and is therefore void.

V. If the plaintiff can sustain no action upon the note itself, it is equally clear that he cannot sustain an action for money paid. 1. As a general rule, an indorser who takes up a note cannot maintain an action for money paid, against the previous parties on the note, but must bring his action directly upon the note. (6 *Wend.* 284. *Chitty on Bills*, 595.) 2. The action can only be sustained when the money has been paid at the request of the defendant, express or implied. The request is implied from the legal liability of the defendant to indemnify the plaintiff. (6 *Wend.* 289.) 3. As there was no obligation upon the defendant to indemnify the plaintiff, no request can be implied in this case. 4. As both the plaintiff and defendant were parties to the illegal enterprise, and as the note was made to carry it on, the action would not lie if a special request had been proved. (10 *Bing.* 107. 3 *Moore*, 511. *Chitty on Cont.* 600.)

VI. The referee erred in holding the defendant liable for the costs of the suit against the plaintiff. The defendant was clearly in no worse condition than he would have been as maker of a business note. (*Chitty on Bills*, 569. 9 *John.* 131.)

*Charles Andrews,* for the respondent.

I. The referee finds that the note of July 12, 1858, given by the defendant to "The Onondaga Fine Salt Manufacturing Company," was void, on the ground that the purposes and objects of the company or corporation were illegal. The particular illegality found by the referee consists in this: "That the professed object of said corporation was the manufacture of fine salt, but the real object and purpose thereof was to control, regulate and limit the quantity of salt to be manufactured during the year 1857, and to control, regulate and increase the market price and value thereof, and to control the sales of salt that should be manufactured." If it was important to the decision of this case, it would be difficult to sustain the finding of the referee in this respect. "The Onondaga Fine Salt Manufacturing Company," was a corporation organized under the act of February 17, 1848, to "authorize the formation of corporations for manufacturing, mining, mechanical or chemical purposes," for the manufacture of fine salt. Nothing being shown to the contrary, the presumption is that it was regularly organized. The act declares that upon the filing the certificate, "the persons who shall have signed the same, &c., and their successors, shall be a body politic and corporate in fact and in name," and they are empowered to purchase, hold and convey real estate necessary to enable the company to carry on the operations named in such certificate. (*Laws of* 1848, *ch.* 40, § 2.) The act of the corporation in taking a lease of the salt block of the defendant, and in employing the defendant, to manufacture salt for the company, upon the terms stated in the lease and agreement between them, was within the corporate power of the company. The laws of 1841, (*ch.* 183, § 16,) provide, that "any owner, occupant or person having charge of any manufacture of salt, who shall combine or conspire with, or enter into any combination, arrangement, agreement or understanding with any per-

son or persons, to limit, restrict or fix the time or manner of operating or running such work, or to increase, regulate or fix the price of salt, or the amount to be manufactured, shall be deemed guilty of a misdemeanor." The learned referee holds that the corporation and its contracts are illegal, for the reason that the intent of the corporators in organizing the company, was to accomplish a purpose prohibited by the law of 1841. This position, we submit, cannot be maintained. 1st. The statute of 1848, allows a corporation to be organized for the manufacture of salt. Such a corporation is expressly recognized by the act of 1857. (*Ch.* 29, § 1.) 2d. The taking of the lease and the agreement made by the corporation, with the defendant, to manufacture salt for the company, was within the incidental power of the corporation. The corporation was authorized to enter into such an arrangement, to carry out the purposes of the corporation, viz., the manufacture and sale of salt. 3d. The acts of the corporation, within the scope of its powers, as defined by the certificate, cannot be invalidated because they may tend to accomplish the purpose which is prohibited by the act of 1841, or because of any secret intent of the corporators in organizing the company. Whatever purpose the corporation could accomplish, while acting within its powers, cannot be said to be illegal. Corporations, of necessity, are monopolies. They possess powers which do not belong to individuals. If the statute gives them broader powers than are consistent with public policy, the remedy is with the legislature. Judge Duer, in *Palmer* v. *Lawrence*, (3 *Sandf.* 169,) says: "Upon complying with the statute and filing the certificate, the association becomes a corporation, and from that time every individual is precluded from denying its legal or corporate existence. If there was any illegality or fraud in its organization—if from inadvertence or design any of the material facts set forth in the certificate were untrue—the association may undoubtedly be dissolved by the action

of the sovereign power of the State, but as between the company and individuals, no evidence of such illegality or fraud can be given, to invalidate its certificate or disprove its legal existence or title." *Triton Ins. Co.* v. *McFarlan,* 4 *Denio,* 392. *Brouwer* v. *Appleby,* 1 *Sandf.* 158. This rule does not prevent a defense founded upon the acts of a corporation in excess of its powers, or where the object of the corporation is criminal, as shown by the certificate under which it was organized. The statute of 1841 is not aimed at corporations. Corporations are not named in it, and the prohibition of the statute is created only by the penalty which, of necessity, could not be enforced against corporations. (2 *Kent's Com.* 279.)

II. If, however, the acts of the corporation were illegal, and the note of July 12, 1858, for which the note paid by the plaintiff was given, was void, as given upon an illegal consideration between the defendant and the company, yet the plaintiff was entitled to recover in this action, as for money paid by him for the defendant, upon his contract of indorsement. The general rule is well settled, that a contract, bottomed upon an illegal transaction, where the consideration or the promise is in respect to a matter prohibited by the common or statute law, cannot be enforced. This rule is enforced to protect the dignity of courts, and to discourage violations of the law. So also a new contract for the purpose of carrying into effect the provisions of a previous illegal contract, is infected with the vice of the original contract, and is also void. (*Gray* v. *Hook,* 4 *Comst.* 449. *Barton* v. *Plank R. Co.,* 17 *Barb.* 397.) There is great diversity in the decisions upon the question, as to what contracts are so connected with an illegal consideration as to render them incapable of enforcement. Extreme views upon this subject have been taken, but the tendency of the later decisions, is to restrict the rule invalidating contracts by reason of an illegal con-

sideration, so that it shall not avoid contracts not directly-calculated to accomplish an illegal purpose, or which are founded upon new transactions between the parties. Story (*Conflict of Laws, p.* 207) says : " The principle of invalidating contracts for the immorality, or illegality, of the consideration, is not to be extended to new transactions after the illegal act, although accompanied with knowledge thereof." In *Armstrong* v. *Toler,* (11 *Wheaton,* 261,) Marshall, J., says : " To connect distinct and independent transactions with each other, and infuse into one, perfectly fair and legal in itself, the contaminating matter which infected another, would introduce extreme mischief into the ordinary transactions and affairs of life, not compensated by any accompanying advantage." ·Again : " The rule has been sometimes carried to inconvenient lengths, the difficulty being not in any unsoundness of the rule itself, but in its application. Does the taint of the original transaction affect and vitiate every contract growing out of it, however remotely connected with it ? This would be to extend the rule beyond the policy which produced it, and would lead to the most inconvenient consequences. Carried to such an extent, it would deserve to be entitled a rule to encourage and protect fraud. So far as this rule operates to· discourage the perpetration of an immoral or illegal act, it is founded in the strongest reason, it cannot safely be pushed further." Verplanck, senator, in *De Groot* v. *Van Duser,* (20 *Wend.* 408,) says : " Public policy, it would seem, could go no further than to refuse to enforce contracts which went directly and immediately to the violation of the laws of the land, or of public morals. It would defeat its own ends if it made void all contracts remotely, indirectly, consequentially or contingently tending to any such violation, just as it would do, if it invalidated contracts growing subsequently and secondarily from an illegal transaction." To invalidate a contract on the

Burton *v.* Stewart.

ground of the plaintiff's knowledge that his part of it would aid an illegal act—the means furnished by him must be such as are dirctly necessary and essential to such a purpose, and be supplied with the express intent to accomplish that object. (*Id. p.* 409.) The test, whether a demand connected with an illegal act is capable of being enforced at law, is, whether the plaintiff requires aid from the illegal transaction to establish his case. (*Chitty on Cont.* 657. *Sampson* v. *Bloss,* 7 *Taunt.* 246.) In *Buck* v. *Albee,* (26 *Verm.* 190,) the court says : "In the application of this rule, it may be observed that in all cases where it is necessary to prove the illegal act to enable the plaintiff to recover, then the contract is so connected with the illegal act that no recovery can be had. But if the right can be established without such proof, the plaintiff can recover." New contracts, after the illegal act, are not void unless they are founded directly upon it, and are entered into to carry the original contract into effect. (*Armstrong* v. *Toler,* 11 *Wheat.* 258.) "If an act in violation of the statute or common law be already committed, and a subsequent agreement be entered into, which, though founded upon, constitutes no part of the original inducement or consideration, such an agreement is not void." (*Story on Cont.* § 622.) The application of these general principles to this case, will sustain the recovery. 1st. The referee finds, in substance, that the note of July 12, 1858, given for salt manufactured by the defendant under his agreement with the salt company, and taken by him as upon a sale by the company, was void in the hands of the company, by reason of the illegal intent of the defendant and the company in entering into the agreement. The immediate object of the defendant in giving the note, was to entitle him to his share of the earnings and profits of the corporation. The giving of notes was not contemplated as a means of carrying into effect the illegal purposes of

the corporation, and if illegal, it is on the ground that it was given in aid of, although collateral to the main purpose of the corporation. The referee does not find that the note was given upon an illegal contract between the plaintiff and defendant. The plaintiff made no contract with the defendant. The note of July 12, 1858, was a contract in law and in fact between the defendant and the corporation. It was not given upon any consideration ·passing between the defendant and the plaintiff. It was no part of the original arrangement to effect the illegal purposes of the corporation, that the plaintiff should individually be a party to any obligations taken by the company. The fact that the plaintiff was president of the company, and knew (although this fact is not found) of the illegal purposes for which it was organized, does not deprive him of the right to recover for money paid by him as indorser of the subsequent note of Sept. 13, 1858, which was given to renew and take up the note of July 12, in the hands of a *bona fide* holder, unless the contract of indorsement was made directly in aid of the original illegal design. Kent (2 *Kent's Com.* 466) says: "If a contract be unconnected with the illegal act, and founded on a new consideration, it may be enforced, although the illegal act was known to the party to whom the promise was made, and he was the contriver of the illegal act." Marshall, Ch. J., (in *Armstrong* v. *Toler*,) says: "After the act is accomplished, no new contract ought to be affected by it." 2d. The note of July 12, 1858, was made by the defendant, payable to the order of the plaintiff individually. The form of the note carried with it an authority from the maker to the payee to indorse and transfer it. This was especially so, when the payee named was not the real party in interest to the note. (*Edwards on Bills*, 250. *Taylor* v. *Croker*, 4 *Esp.* 187.) The indorsement of the note by Burton, was not in contravention of the intention

of the defendant. It was no part of the original scheme to accomplish the illegal purposes of the corporation. 3d. When the note of July 12 became due, the defendant was legally and primarily bound to its payment. He made a new note to take up and renew it. This note was also indorsed by Burton, for that purpose. The new note was given in satisfaction of the first one. Thereupon a new contract arose between the defendant and Burton, whereby Burton became surety for the defendant, and upon payment of the debt by him, an undertaking in consideration of the indorsement and payment was implied, that the defendant should refund the money. (*Edwards on Bills*, 293.) If the original illegal contract had been between the defendant and the plaintiff individually, a promise, by the defendant, to repay the money to the plaintiff, would have bound him. *Faikney* v. *Reynous*, (4 *Burr.* 2069,) is a leading case, which has sometimes been questioned, but has not been overruled, and it has been approved frequently by our courts. (*Ex parte Bulmer*, 13 *Vesey*, *Jr.*, 313. *Tracy* v. *Talmage*, 14 *N. Y.* 195. *Armstrong* v. *Toler*, 10 *Wheat.* 261.) In that case, the plaintiff and one Richardson were jointly concerned in certain contracts prohibited by law, on which a loss was sustained, the whole of which was paid by the plaintiff. Richardson gave a bond to repay his proportion of the loss. To a suit on the bond, the defendant pleaded the illegal transaction, and on demurrer the court held, that the plaintiff was entitled to recover. Judge Marshall says: "This is a strong case to show that a subsequent contract, not stipulating a prohibited act, although for money advanced in satisfaction of an unlawful transaction, may be sustained." In *Petrie et al., ex'rs of Keeble*, v. *Hannay*, (3 *T. R.* 418,) the plaintiff's testator was engaged with the defendants and others in stock transactions forbidden by law, on which losses were sustained, which were paid by their

broker. Keeble repaid the broker all but 84 pounds, which was, in part, the defendants' share of the loss, for which Keeble drew a bill on the defendant which he accepted. The broker sued the drawer on the bill and recovered, and the executors of Keeble brought an action against the defendant for money paid on the bill, and the court sustained the action. In both of these cases, the suit was between the parties to the original illegal contract. 4th. The test of the right to recover on an illegal contract, to wit, whether the plaintiff is compelled to rely upon the original illegal transaction to sustain his claim, applied to this case, entitled the plaintiff to recover. The plaintiff relies upon a contract entirely disconnected with the illegal transaction. He is not compelled to resort to it to establish the liability of the defendant. 5th. The injustice of defeating the plaintiff in this case is apparent. The defendant, in fact, would be allowed to enforce an illegal contract against the plaintiff, although he was primarily liable. The defendant procured one Kenyon to take up the note and sue the plaintiff upon it.

If the plaintiff is defeated, he is compelled to pay the defendant's debt, while the defendant retains his interest in the profits of the corporation, which this note was given to secure.

*By the Court.* MULLIN, J. This court has held, more than once, that the corporation known as the Onondaga Fine Salt Manufacturing Company was organized for an illegal purpose, and that all contracts entered into with it, for giving effect to the illegal purposes of the corporation, are illegal and void.

This question is not, therefore, open for discussion in this case.

The note made by the defendant, bearing date the 12th of July, 1858, was given to the corporation upon a settlement between it and the defendant of dealings growing

out of the illegal operations of said corporation, and as between the original parties to that note, it was unquestionably illegal and void.   The plaintiff was the president of the corporation.   He became the payee and indorser of the note, without any request, and indeed without the knowledge of the defendant.   As agent of the corporation, the plaintiff settled with the defendant, and had knowledge of the consideration of the note.   As between the defendant and the plaintiff, it seems to me quite clear that the note was without any legal consideration to support it.

When, however, that note was transferred to the Syracuse City Bank, and by it discounted, before maturity, and without notice, for value paid, the note becomes, in its hands, valid and operative against all the parties to it. While in the hands of the bank or of any other parties deriving title by, through or under it, the defendant could not avail himself of the defense which, as against the plaintiff or other holder not *bona fide*, he unquestionably had to the note.

Had the plaintiff taken up that note, at maturity, he could not have recovered on it, against the defendant.   In that case the plaintiff would have held the note clothed with the same rights he had at the time of the transfer to the bank, and the defendant would have been entitled to the same defense he had before it was transferred to the bank.   (*Leonard* v. *Barker*, 5 *Denio*, 220.)

It is argued by the plaintiff's counsel that the first note (that of July 12, 1858,) is not tainted with the illegality arising from the illegal purposes and proceedings of the corporation, because it was not given in furtherance of such illegal objects, but is entirely collateral thereto.

The Supreme Court of the United States, in *Armstrong* v. *Toler*, (11 *Wheat.* 258,) held that when a contract grows immediately out of, and is connected with, an illegal or immoral act, a court of justice will not lend its aid to enforce it.   So if the contract be in part only connected

with the illegal consideration, and growing immediately out of it, though it be in fact a new contract, it is equally tainted by it. But if the promise be entirely disconnected with the illegal act, and founded on a new consideration, it is not affected by the act, although it was known to the party to whom the promise was made, and although he was the contriver and conductor of the act. (*Faikney* v. *Reynous*, 4 *Burr.* 2069. *Peters* v. *Hanney*, 3 *D. & E.* 418.)

The note of July 12, had no consideration except that which grew out of the illegal acts and proceedings of the salt company. It grew out of, and was directly connected with, such acts and proceedings, and within the principles of the case of *Armstrong* v. *Toler*, it was void.

When the first note matured, the defendant was liable thereon for the full amount of it and interest. The debt was perfectly valid against all the parties to the paper. Under these circumstances, the new note was made, to pay the former one. As between the bank and the parties to the new note, there was a perfectly good consideration.

The defendant participated in giving the new note. The plaintiff was the payee of the new as well as of the old. Personally he had no interest in either. When, therefore, the new note was indorsed by him, he became an accommodation indorser for the defendant. It is true that no request from the defendant to the plaintiff to become indorser on the second note is found by the referee; but it is quite clear, from the evidence in the case, that the defendant was the principal debtor to the bank, and that the plaintiff was surety not only in his character as indorser, but because he was indorser without any personal interest in the note or its consideration, except so far as he was a member of the corporation. The renewal, then, was for the benefit of the principal debtor. In the absence of any proof that the plaintiff became indorser at the request of some one else, it seems to me we must presume that the plaintiff became such at the request of the defendant.

Burton *v.* Stewart.

It is true, for all purposes of a legal remedy, on the paper, the law assumes the note to have been made upon a consideration moving between the maker and payee, and that the payee receives it in the regular course of business, and transfers it, by his indorsement, on a consideration moving between him and his indorsee. But the law permits this presumption to be overcome and the true relations of the parties to be ascertained.

It would not be contended, I apprehend, that the plaintiff would not have been entitled to recover if it were shown that the note was renewed at the request of the defendant, and that the plaintiff indorsed it at his request, for his accommodation. Such evidence would bring the case within the principle asserted in *Armstrong* v. *Toler,* that although the note grew out of an illegal transaction, yet, inasmuch as it rested on a new consideration, it was not affected by such illegal consideration. But aside from this principle, it seems to me, the parties occupy entirely new relations to the second note, and that the plaintiff became, as to the note, a surety for the defendant, while, as to the former note, he became indorser for the benefit of the corporation, and he had none of the rights of an indorser for the accommodation of the defendant, nor was he clothed with any of the rights of the bank, which was a *bona fide* holder.

It was optional with the plaintiff to sue on the note, or for the money paid upon it. Had he sued on the note, he could have recovered no more than the face of the note, with interest; whereas, by suing for the money, he becomes entitled not only to the amount of the note and interest, but also to the costs paid by him in the suit upon it.

It is said in *Edwards on Bills,* (293,) that an accommodation indorser stands in the relation of surety towards the party for whose accommodation the indorsement is made, and may recover against him the costs to which he

has been subjected; but he does not thereby lose the character as indorser towards the holder of the note.

I am therefore of the opinion that the judgment ought to be affirmed.

[ONONDAGA GENERAL TERM, April 1, 1862. *Morgan, Mullin* and *Bacon,* Justices.]